**Lawrence M. MILLER, Plaintiff-Appellee,**

v.

**CINCINNATI, NEW ORLEANS AND TEXAS PACIFIC RAILWAY COMPANY, Defendant-Appellant.**

No. 14954.

United States Court of Appeals
Sixth Circuit.

May 22, 1963.

Dawson Hall, Chattanooga, Tenn., Whitaker, Hall & Haynes, Chattanooga, Tenn., of counsel, for appellant.

Ray Siener and Joe Van Derveer, Chattanooga, Tenn., Van Derveer, Brown & Siener, Chattanooga, Tenn., on the brief, for appellee.

Before MILLER, McALLISTER and O'SULLIVAN, Circuit Judges.

O'SULLIVAN, Circuit Judge.

This is an appeal from a judgment for plaintiff entered upon a jury verdict of $24,000. The action was brought under the Federal Employers' Liability Act. Title 45 U.S.C.A. §§ 51–60. Defendant-appellant railroad asserts that a verdict should have been directed for it, contending that the proofs did not present a jury question as to negligence or proximate cause. The District Judge held that the issue of proximate cause was for the jury and that, applying the doctrine of res ipsa loquitur, so also was defendant's negligence. He denied defendant's motions for a direction and for judgment non obstante veredicto.

1. *Negligence.*

This question is narrowed to the inquiry as to whether there was sufficient evidence from which a jury could find that defendant had constructive notice of the defective condition of an appliance (a fire hose nozzle) claimed to have caused plaintiff's injuries. Plaintiff injured his right arm while returning such nozzle to its bracket after it had, from a cause unknown, become disengaged from such bracket. The nozzle, as well as the hose of which it was a part, was housed in a

small shed or building (8 by 10 feet square) adjacent to the railroad's machine shop. A window opening into the machine shop provided a ready mode of access to the fire hose. The hose was wound upon a reel which rested upon a pump box in the shed. In this metal box were contained electric pumps which, when activated, increased the available water pressure from about 130 pounds to 800 pounds. The high pressure nozzle, approximately two feet in length and having a pistol type grip, was attached to the end of the hose. The hose and its nozzle extended down to the side of the pump box. There, two brackets were provided to hold the nozzle and its trigger mechanism while the same were not in use. When the nozzle was removed from the bracket, the electric pump started automatically. If the machine was working properly, however, no water would come out of the nozzle until the grip trigger was pressed, or pulled. The proofs showed that while plaintiff was in the act of putting the nozzle into its bracket, and without the trigger being pressed, water surged out of it. He stated that, while he was so replacing the nozzle, his right arm hit a piece of angle iron on the pump box and that he was thereby injured.

An expert witness for plaintiff described the working parts of the nozzle, its trigger and the electric pumps. It was not disputed that although removing the nozzle from its bracket immediately increased the water pressure, no water should be discharged without pulling the trigger. This expert, at first, by viewing an exhibit which he thought was a photograph of the nozzle in question, testified that the defect which caused the improper discharge of water was that the trigger was not properly positioned. Cross-examination, however, disclosed that the exhibit which the expert relied upon and which disclosed an improperly placed trigger, was not a photograph of the allegedly defective nozzle. Pictures of the nozzle involved, although they did not expose the inner mechanism of the

nozzle and its trigger, did not disclose any observable defects. The expert then gave his deduction that the fact that water was discharged without depressing the trigger proved that the nozzle was defective. A witness for defendant agreed that such deduction was valid. In its address to this Court, defendant does not question that the foregoing would permit a jury to find that the appliance in question was defective at the time of the injury.

■■ Defendant, however, properly argues that negligence cannot be predicated solely on the fact that the appliance was defective.[1] Under familiar law, defendant could not be convicted of negligence, absent proof that such defect was known, or should or could have been known, by defendant, with opportunity to correct it. 56 C.J.S. Master and Servant § 244, p. 1000. Carnegie Steel Co. v. Byers, 149 F. 667, 669 (C.A.6, 1907); Atlantic Coast Line R. Co. v. Collins, 235 F.2d 805, 809 (C.A.4, 1956) cert. denied 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238. This rule is applicable to FELA actions where negligence is essential to recovery. Kaminski v. Chicago River & Indiana R. Co., 200 F.2d 1, 3, 4 (C.A.7, 1952); Wilson v. Missouri Pacific R. Co., 319 Mo. 308, 5 S.W.2d 19, cert. denied 278 U.S. 622, 49 S.Ct. 25, 73 L.Ed. 543. The establishment of such an element, however, may come from proof of facts permitting a jury inference that the defect was discovered, or should have been discovered, by the exercise of reasonable care or inspection. 56 C.J.S. Master and Servant § 248, p. 1002. The resolution of this question in the case at bar is made difficult because the record is entirely barren of any evidence by plaintiff or defendant as to the history of the defective appliance prior to plaintiff's injury.

A supervisory employee of defendant testified that after plaintiff's injury and on the same day, he examined and tested the accused nozzle and found it in proper working condition. There was further defense testimony that at all times after

1. This is not an action under the Safety Appliance Acts, 45 U.S.C.A. §§ 1–43.

the injury, which occurred on August 7, 1958, and up to the time of trial in 1961, the nozzle worked correctly and that it had never been repaired. A few days before the trial, apparently when an employee of defendant was getting ready to bring the nozzle into court, a leak was discovered. This employee testified, "I noticed briefly that it does have a leak, that was yesterday, just a small drip. * * * Usually when you open it up and then shut it off, it will drip a little for a while after you shut it off." Defendant offered no evidence as to how long it had owned the fire fighting equipment, what use had been made of it, whether it had ever been inspected, or whether any system of inspection was practiced. Plaintiff offered no evidence on this subject. The District Judge's opinion, denying defendant's motion non obstante, summed up the evidence by saying, "There is a complete absence of any evidence of when or how the defect arose or how long it had existed." He further made bare the legal point involved, "Unless proof by the plaintiff of the existence of the defect at the time of the injury is, standing alone and of itself, sufficient to create a jury issue as to the actual or constructive knowledge of the defect by the defendant, there is a complete absence of evidence in the record to support a verdict upon this issue."

■ The District Judge held that an issue as to notice was made. We agree. We make clear, however, that in so holding, we depend entirely on the doctrine of res ipsa loquitur which is applicable to actions under the Federal Employers' Liability Act. Southern Railway-Carolina Division Co. v. Bennett, 233 U.S. 80, 34 S.Ct. 566, 58 L.Ed. 860; Southern R. Co. v. Derr, 240 F. 73 (C.A.6, 1917); Baltimore & Ohio R. Co. v. Kast, 299 F. 419 (C.A.6, 1924) cert. denied, 266 U.S. 613, 45 S.Ct. 95, 69 L.Ed. 468; Didinger v. Pennsylvania R. Co., 39 F.2d 798 (C.A. 6, 1930); Chesapeake & Ohio R. Co. v. Smith, 42 F.2d 111 (C.A.6, 1930) cert. denied 282 U.S. 856, 51 S.Ct. 32, 75 L.Ed. 758; Lowery v. Hocking Valley R. Co., 60 F.2d 78 (C.A.6, 1932); Carpenter v. Baltimore & Ohio R. Co., 109 F.2d 375 (C.A.6, 1940); Nashville, C. & St. L. R. Co. v. York, 127 F.2d 606 (C.A.6, 1942). See annotation 35 A.L.R.2d 475, 491, 493.

■ It is not questioned here but that plaintiff's proofs were, under res ipsa loquitur, sufficient to establish that the hose and its nozzle were defective at the time of plaintiff's injuries. Having gone this far, does the doctrine permit supplying by inference the other essential to defendant's negligence, viz., actual or constructive notice of such defective appliance. We think it does. As stated in Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815, 819, "* * * [R]es ipsa loquitur means that the facts of the occurrence warrant the inference of *negligence* * * *." (Emphasis supplied.) If application of the doctrine permits an inference of *negligence,* such inference must necessarily include all the essential elements of negligence, including here an inference that defendant had actual or constructive knowledge of the defective condition of the nozzle.

We find no case which, in precise language, supports what we have just said. However, a fair construction of relevant decisions does support us. In Southern Railway-Carolina Division Company et al. v. Bennett, 233 U.S. 80, 85, 34 S.Ct. 566, 567, 58 L.Ed. 860, 863, the Supreme Court held not erroneous an instruction to the effect that "[I]f a servant is injured through defective instrumentalities, it is prima facie evidence of the master's negligence and that the master 'assumes the burden' of showing *that he exercised due care* in furnishing them." (Emphasis supplied.) In Lowery v. Hocking Valley Ry. Co., 60 F.2d 78, 79 (C.A.6, 1932), this Court was dealing with an FELA case where plaintiff was injured because of a train derailment. This was caused by a piece of plank picked up at a crossing which got under the train wheels and derailed it. There was no evidence as to the crossing being improperly constructed or the train equipment being out of repair prior to the accident, but we held that the doc-

trine of res ipsa loquitur permitted an inference of the railroad's negligence and said,

> "Heavy planking is not ordinarily torn from its location at a crossing and carried by a passing train * * * unless there has been negligence either in placing the crossing plank at too high a level, or in *permitting the train equipment to become out of repair* and some part of it to fall or reach down below the level of the normal crossing, or both." (Emphasis supplied.)

In Carpenter v. Baltimore & Ohio R. Co., 109 F.2d 375 (C.A.6, 1940), this Court dealt with a case where a railroad employee was injured when a ball, or counterweight, fell from a crane. There was no evidence of previous defects in the crane. Defendant offered evidence that an inspection of the crane and all its attachments, made immediately after the accident, disclosed no defects and that the crane operated perfectly. In holding that res ipsa loquitur applied, we took occasion to say, "[T]he falling of the weight under the circumstances of this case, *in itself,* was some substantial evidence of *negligence* on the part of appellee." In Restatement of the Law, Agency, Second, § 503, speaking of res ipsa loquitur, the authors say, "The existence of a defect in a structure or instrumentality may, *of itself,* constitute evidence sufficient to warrant a finding that the master *has failed in his duty of inspection.*" (Emphasis supplied.)

The District Judge placed some reliance on the case of Norfolk & W. R. Co. v. Hazelrigg, 184 F. 828,[2] (C.A.6, 1911). There, a plaintiff was injured because of an allegedly defective coupling device. Plaintiff made alternative claims that the device was defectively made or became out of repair. On the lack of repair claim, Judge Knappen assumed that the plaintiff had to prove that defendant would be responsible only for *"negligent failure to keep the coupling device in repair"* but said,

> "[W]here it is apparent that a car with a defective coupling device has been hauled upon defendant's track, the burden is upon the defendant to prove that it has used all reasonably possible endeavor to discern and correct the fault. The plaintiff had made his prima facie showing of negligence when he showed a defective condition of the coupling device * * *."

In Hunter v. Illinois Central R. Co., 188 F. 645 (C.A.6, 1911), a brakeman had been killed in a collision caused by defective brakes on a runaway freight car. Plaintiff's evidence showed that following the collision, the brakes were defective. The defendant railroad offered no evidence as to the condition of the brakes before the accident. Neither did plaintiff. Without employing the doctrine of res ipsa loquitur, Judge Knappen of this Court said,

> "In view of the uncontradicted testimony that deceased was unable to produce any effect upon either the box car or the coal car by the application of the brakes, the jury would have been justified in inferring that the brakes upon both cars were defective *previous to the accident.* And, in view of the fact that there was no testimony whatever of *any inspection of the cars in question by the railroad company previous to the accident,* we think that in the case of the car just brought in, and lacking at the time of the examination not merely one, but two, brake shoes, and in view of the fact that the coal car likewise had a broken brake chain, *it would have been open to the jury to infer that the railroad company was negligent* with respect to the missing brakes

---

2. This case and Hunter v. Illinois Cent. R. Co., cited below, were decided in the light of this Court's then view of a railroad's responsibilities under the Safety Appliance Act. St. Louis & S. F. R. Co. v. Delk, 158 F. 931 (C.A.6, 1908) and United States v. Illinois Cent. R. Co., 170 F. 542 (C.A.6, 1909). But see Texas & Pacific Ry. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874.

upon the box car." (Italics supplied.)

Finally, we believe that the Supreme Court's treatment of our decision in Baltimore & Ohio R. Co. v. O'Neill, 211 F.2d 190 (C.A.6, 1954) (reversed without opinion, sub nom. O'Neill v. B. & O. R. Co., 348 U.S. 956, 75 S.Ct. 447, 99 L.Ed. 747) supports the position we take here. In that case, there was evidence that while putting an ash pan in place under a locomotive, a workman was injured through the breaking of a bolt. This bolt had been taken by the injured employee from the railroad's storeroom. There was no direct evidence that the bolt was defective. Applying res ipsa loquitur, this Court's majority said, "There was no evidence that the bolt was defective, although we think the evidence reasonably supports the inference that the bolt broke because it was defective," and further expressed its view that res ipsa loquitur gives rise to an inference of lack of due care which *"if not satisfactorily explained,* is sufficient to take the case to the jury on the question of negligence." (211 F.2d at 194.) Explanatory evidence was given by defendant railroad that the bolt had been purchased new in the usual course of business without notice of any defect. With this explanation, the majority held that there was no evidence "that the appellant knew or should have known that it was defective" and that, as a matter of law, plaintiff's establishment of negligence by the inference permitted by res ipsa loquitur had been overcome. In a dissenting opinion, Judge McAllister said (211 F.2d 197, 198):

> "The rule of *res ipsa loquitur* creates an inference of fact. It casts on the opposite party the duty of going forward with evidence or risking that the jury will infer negligence from the occurrence. * * * "There was no proof that the bolt which broke was ever inspected * * *. The happening of the accident, under the circumstances disclosed in this case, called for application of the doctrine of res ipsa loquitur and justified the drawing of an inference of negligence on the part of the railroad company. It cast upon the railroad the duty of going forward with the evidence * * *. It required a submission to the jury, since the mere fact that the bolt was new and unused was not such evidence that the inference of negligence could not stand against it. Even though witnesses might have testified as to inspecting the bolt before the accident, it would still be for the jury to pass upon their credibility and the truth of the testimony."

Even though the Supreme Court's per curiam gave no reason for its reversal of our decision in the above case, we think it fair to conclude that its ruling was an approval of Judge McAllister's dissent.[3] It remanded the case to the District Court for reinstatement of the plaintiff's judgment which had been set aside by our opinion and order.

 In the case at bar, the defendant railroad offered no evidence as to previous condition, inspection or prior functioning of the allegedly defective nozzle. Under both views expressed by the opinions in our O'Neill case, supra, there was sufficient evidence in the case at bar from which the jury could find defendant guilty of negligence, including the essential fact of actual or constructive notice of the defective appliance.

2. *Proximate cause.*

Defendant asserts that there was no competent evidence from which the jury could find that the defective nozzle proximately contributed to plaintiff's injury. In considering this point, we supplement the facts above recited. Plaintiff was what was called an engineer-carpenter. It was no part of his duties to care for or operate the described fire fighting equipment. His presence in the building

---

3. Such was the view of the Ninth Circuit in Bedal v. Hallack & Howard Lumber Company, 226 F.2d 526, 538 (C.A.9, 1955).

that housed the fire fighting equipment was for the purpose of welding certain brackets to the ceiling of the building. The close quarters there required him to climb up on top of the fire hose reel and, with his welding electrode in one hand and his eye shield in the other, proceed with his work. While the work was in progress, or at its conclusion, the fire hose nozzle "kicked out" of its bracket. When it did so, "It was kicking back and forth, up and down, spraying water across the end of the building." The plaintiff thereupon reached down with his left hand and placed the nozzle on top of, but not into, the clamps of its bracket. This stopped the flow of water. He then climbed down and while standing on the ground at one end of the box-like housing of the electric pumps, reached around with his right arm to the side of such housing where the nozzle bracket was located. He did this in order to replace the nozzle *within* its bracket, having already placed it on *top* of its bracket. His reason for so doing was, as stated by him, "The only thing I could think of was to try to get that back like it was before the foreman seen it." Plaintiff also gave some rather vague, difficult to understand testimony, that fear of electrocution from the combination of the sprayed water and the electrode he was using prompted his handling of the nozzle. Defendant attacks such claim. We do not consider that claim important, however, as we think the effort to put the nozzle where it belonged was a very natural thing to do, whatever its motivation.

The defendant contends that the defective condition of the nozzle which allowed water to come out without trigger pressure had nothing to do with plaintiff's injury. Defendant states its position in this regard as follows:

"At the time appellee attempted to place the nozzle back into the bracket, he had finished his job and was standing squarely on the concrete floor in the house. The nozzle was not leaking, and it was not because of its leaky condition that he attempted to restore it, but rather because he did not want the foreman to find it out of the bracket, which would have been the case if it had been in perfect condition."

There is no proof that the nozzle's defective condition had anything to do with it "kicking out" of its bracket while plaintiff was working in the area. Its defect, allowing water to spray around the room, was, of course, part of the motivation for plaintiff's initial placing of it on top of the bracket. The plaintiff, however, was not then, or thereby, injured. His decision thereafter to replace it in the bracket was not motivated by its leaky condition, and he testified that he did not expect it to again spray water when he moved it from on top of to within the bracket. His choice of an awkward method of doing so was not, in our opinion, related to its defective condition and if the unusual injury, "a traumatic rupture of the longhead of the right biceps tendon," was due solely to plaintiff's bumping his arm against the corner of the pump housing and that such bump was not caused in any degree by the fact that the nozzle sprayed water while he was so replacing it, we would agree that the defect played no causal part in the injury. Reetz v. Chicago & E. R. Co., 46 F.2d 50 (C.A.6, 1931). Applying traditional concepts of proximate cause, however, we think that the jury here could find a direct causal connection between the defective nozzle and the plaintiff's injury.

There was evidence that removal of the nozzle from its bracket started the pumps and increased the water pressure from about 125 pounds to 800 pounds, and upward. Water should not come out of the nozzle, even under such pressure, unless the trigger was pulled. Without such trigger being pulled, however, water did come out of this defective nozzle. The effect of the combination of the increased water pressure and the defective nozzle was, as described by plaintiff, to cause the hose to start "kicking back and forth, up and down, spraying water across the end of the building." This

was how it acted when the nozzle first "kicked out" of its bracket. Plaintiff testified that when he was in the act of putting the nozzle back in its bracket and while standing in the described awkward position, "well, that *gave a great surge again*. As I put it back into its bracket, this arm hit that angle iron on the side of the machine * * * and that's when it tore that muscle loose." He further stated, "as soon as I taken it off that bracket, to raise it out enough to come back in the bracket, why it started again, *give a hard surge*." All of this occurred without the trigger being pressed. Plaintiff also testified that he did not anticipate that moving the nozzle from on top of to within the bracket would start the pumps and allow water to "surge out."

From the foregoing, we think a jury could infer that the unexpected surging of the water under high pressure had a part in causing plaintiff's arm to "hit that angle iron on the side of the machine." Even though plaintiff's awkward method of reaching for the nozzle was an important factor in the accident, and even if some minds might conclude that it was the sole factor, we think a jury could find that the sudden surge of water from the nozzle then in his hand played a part in the casualty.

■ Viewing the evidence, as we must, in the light most favorable to plaintiff, Wilkerson v. McCarthy, 336 U.S. 53, 57, 69 S.Ct. 413, 415, 93 L.Ed. 497, 502; Webb v. Illinois Central R. Co., 352 U.S. 512, 514, 77 S.Ct. 451, 453, 1 L.Ed.2d 503, 505, and applying the rule of Rogers v. Missouri Pacific R. Co., that in these cases "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury * * *." (352 U.S. 500 at 506, 77 S.Ct. 443, at 448, 1 L.Ed.2d at 493, 499) we think the question of proximate cause was properly submitted for the jury's determination.

Judgment affirmed.